## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHANE S. STROTMAN,       :   Civil No. 1:19-CV-0746
                       :
       Plaintiff,       :
                       :
       v.             :
                       :
CORRECT CARE SOLUTIONS, *et al.*,  :
                       :
       Defendants.     :   Judge Jennifer P. Wilson

### <u>MEMORANDUM</u>

Before the court is a motion for summary judgment filed by Dr. Darrell Petz and Correct Care Solutions, LLC, seeking the dismissal of self-represented Plaintiff Shane S. Strotman's amended complaint alleging their denial of adequate medical care for his chronic back pain. (Doc. 23.) Plaintiff Strotman had the opportunity to oppose to the Defendants' motion, but failed to do so. Therefore, the court will decide the pending motion for summary judgment without the benefit of Plaintiff's response. For the reasons that follow, the Defendants' motion for summary judgment will be granted and the matter closed.

## MATERIAL FACTS AND PROCEDURAL HISTORY[1]

### A. Procedural History

Plaintiff Shane Strotman ("Plaintiff" or "Strotman"), an individual presently confined at the Huntingdon State Correctional Institution ("SCI-Huntingdon"), in Huntingdon, Pennsylvania, initiated this action on April 15, 2019, in the Court of Common Pleas of Huntingdon County, Pennsylvania.  (Doc. 1-1.)  Strotman filed an amended complaint on June 6, 2019, naming various Pennsylvania Department of Corrections ("DOC") employees, Correct Care Solutions ("CCS"), and Dr. Petz (a CCS employee), as Defendants.  (Doc. 8.)  In his amended complaint, Strotman alleges that Defendants have been deliberately indifferent to his chronic peripheral neuropathy in his back, legs, and feet due to pre-incarceration motor vehicle and all-terrain-vehicle accidents.  (*Id*.)

Strotman claims he regularly received Baclofen since 2012, and it is the only muscle relaxant proven to successfully alleviate his cervical and lumbar spine pain and numbness.  (*Id*. at ¶ 15.)  However, in July and August 2018, while housed at SCI-Huntingdon, Dr. Petz reduced his Baclofen prescription from three times daily to twice daily, and later discontinued the medication entirely.  (*Id*. at ¶ 17.)

---

[1] These facts are taken from the Defendants' unopposed statement of material facts and supporting exhibits.  (Doc. 24.)  Even though Plaintiff did not oppose Defendants' motion, the court must nevertheless satisfy itself that Defendants are entitled to summary judgment as a matter of law.  Therefore, the following facts are undisputed, or where unsupported by the record, reflect Strotman's version of the facts pursuant to this court's duty to view all facts and reasonable inferences in the light most favorable to the nonmoving party.  *See Forrest v. Parry*, 930 F.3d 93 (3d Cir. 2019), *cert. denied sub nom.*; *City of Camden, New Jersey v. Forrest*, 140 S. Ct. 902 (2020).

Strotman also claims CCS Defendants continue to ignore his complaints of radiating nerve pain and sporadic numbness in his legs.  (*Id*.)

In of June 2019, the DOC Defendants filed a motion to dismiss the amended complaint while CCS Defendants filed a partial motion to dismiss.  (Docs. 10, 17.) Strotman did not oppose either motion.  On March 5, 2020, the court dismissed all claims against the DOC Defendants and granted CCS's partial motion to dismiss as to Strotman's state law claim of medical professional negligence.  (Doc. 22.)  The sole surviving issue following resolution of the motions to dismiss is Strotman's Eighth Amendment medical claim against CCS and Dr. Petz.  (*Id*.)

Following the close of discovery, CCS filed the present motion for summary judgment averring that prior to weaning Strotman off Baclofen due to contraindications of its prolonged usage, Dr. Petz and other medical staff ordered additional radiographic studies of Strotman's spine, regularly monitored his complaints of pain, consulted each other and outside specialists, as well as prescribed alternative treatment in the forms of pain management for Strotman including physical therapy and other medications.  (Doc. 27.)  Additionally, Strotman's medical records demonstrate that he had significant access to the medical department at all times relevant to this matter and that his complaints of discomfort were addressed by numerous medical personnel.  (Docs. 24, 23-2.)

On October 27, 2020 the court granted Strotman's request for an enlargement of time to respond to CCS's motion and advised him that his failure to file a response would result in Defendants' motion being deemed unopposed. (Doc. 29.)  To date Strotman has not filed any opposition to CCS's motion or sought an additional enlargement of time to do so.

### B. Strotman's Relevant Medical Care Prior to Dr. Petz's Treatment[2]

In April 2013, while housed at SCI-Albion, Strotman was prescribed Baclofen, a muscle relaxer and antispasmodic agent, 20 mg. twice daily, by Physician Assistant ("PA") Daniel Stroup.  (Doc. 23-2, p. 298.)[3]  Dr. Maxa continued the prescription, in varying dosages, until August 16, 2016, when Strotman was transferred to SCI-Smithfield.  Dr. Maxa's last prescription for Baclofen was issued May 5, 2016, and expired on November 30, 2016.  (*Id.*, pp. 149, 173, 246-298.)  On March 31, 2016, Dr. Maxa ordered radiographic studies of Strotman's cervical spine due to complaints of pain and decreased range of motion. (*Id.*, p. 146.)  The radiologist's impression of the April 4, 2016 four-view study was: "1.  Mild scoliosis and reversal of curvature which may be due to spasm.

---

[2] Defendants assert Dr. Petz only worked at SCI-Huntingdon between April 13, 2018 and August 24, 2018.  Therefore, they argue Strotman's claims against Dr. Petz are limited to that period. The court notes that Defendants do not provide an affidavit or other evidence to support this finding of fact.  However, it is noted that entries by Dr. Petz do not appear in Strotman's medical records after August 8, 2018.  (Doc. 23-2, p. 8.)

[3] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

There is no fracture or dislocation. 2. Stable alignment during flexion and extension maneuvers with no evidence of ligamentous instability." (*Id.*, p. 140.)

Strotman was transferred from SCI-Albion to SCI-Smithfield on August 16, 2016. (*Id.*, pp. 131, 173, 175.)  Upon his intake Strotman complained of a stiff back. (*Id.*, p. 173.)  Following his intake physical, PA Riley noted Strotman was medically stable without any functional limitations. (*Id.*, pp. 148-49.)  During a September 2, 2016 physician's visit, Strotman reported that he was "good but get[s] migraine[s] and leg numbness." (*Id.*, p. 171.)  The physician examined Strotman's cervical spine, noting that he had normal range of motion, and the absence of any swelling or spasms. (*Id.*)  Similar negative findings were recorded with respect to Strotman's lumbar spine examination. (*Id.*)  The physician noted Strotman's history of taking Excedrin for migraines.  The doctor sought to educate Strotman about "rebound headaches" and Excedrin usage.  After reviewing Strotman's X-rays and previous MRI studies, noting no radiographic evidence of degenerative changes, the doctor also planned to educate Strotman on Baclofen. (*Id.*, p. 172.)

On November 30, 2016, Dr. Maxa's script of Baclofen expired. (*Id.*, p. 247.)  On December 2, 2016, Strotman saw PA Riley concerning the renewal of the Baclofen prescription for his lower back pain that radiated down his right buttocks. (*Id.*, p. 169.)  Strotman indicated his pain was not relieved by Neurontin,

Topamax, or NSAIDS.  PA Riley reviewed Strotman's x-rays studies and examined his back, finding no edema, deformities, or spasms.  PA Riley indicated he would discuss the Baclofen renewal with the medical director because Baclofen was not indicated for Strotman's symptoms.  PA Riley also planned to have Strotman return to discuss alternative treatments such as Cymbalta or Pamelor.  (*Id.*, pp. 145, 169.)

PA Riley saw Strotman again on December 7, 2016.  After it was explained that Baclofen is not recommended for continued use, Strotman agreed to try Cymbalta for his chronic pain.  Strotman would be reevaluated in 30 days.  (*Id.*, pp. 169, 246.)  On January 17, 2017, Strotman was seen by PA Riley and a decision was made to switch his Cymbalta medication from morning to evening dispensation.  (*Id.*, pp. 170, 245.)

On March 29, 2017, PA Harris saw Strotman for complaints of leg numbness.  Strotman's lower extremity sensation and motor strength were intact, and PA Harris noted Strotman was not in acute distress.  After reporting little relief from the Cymbalta, PA Harris increased the dosage from 30mg to 60mg.  Strotman was advised to return in 30 days for reevaluation.  (*Id.*, p. 170.)  When Strotman returned on April 12, 2017, PA Harris saw him for complaints of leg numbness, hip pain, and lower back pain.  He reported the Cymbalta was not helping and that only Baclofen relieved his pain.  (*Id.*)  PA Harris examined Strotman's lower

extremities noting his sensation and strength were fully intact and that his 2014 MRI was negative for abnormalities.  PA Harris concluded "Baclofen not indicated per medical director."  (*Id*.)  She also noted Strotman was only 53% compliant with his Cymbalta 60 mg medication.  (*Id*.)  Strotman was educated on the use and compliance of Cymbalta and indications for Baclofen.  (*Id*.)

On May 5, 2017, PA Harris saw Strotman during his placement in SCI-Smithfield's Restricted Housing Unit ("RHU").  He again requested Baclofen.  PA Harris advised that because of his current medications and major potential interactions, Baclofen could not be safely prescribed.  (*Id*., p. 167.)

Strotman was transferred from SCI-Smithfield to SCI-Huntingdon on June 7, 2017.  (*Id*.)  Upon intake, the nurse indicated he was to be evaluated for his complaints of chronic back pain.  (*Id*.)  Certified Nurse Practitioner ("CRNP") Desiree Price saw Strotman the following day.  (*Id*., p. 168.)  At this visit Strotman's medications were renewed and he was advised to sign up for sick call as needed for further concerns.  (*Id*.)

Dr. Robert Valley saw Strotman on July 3, 2017, for a sick call visit for complaints of right leg pain and numbness which was not alleviated by Cymbalta.  Dr. Valley agreed to prescribe Baclofen 20mg, three times daily as needed.[4]  Dr.

---

[4] Strotman did not have an active prescription for Baclofen from December 1, 2016, until it was re-prescribed by Dr. Valley.  (*Id.*, pp. 237–246.)

Valley noted Strotman's complaints of bilateral sciatica. (*Id*.) Ten days later, Strotman reported to sick call with complaints of bilateral leg numbness. He reported taking Cymbalta recently and again requested Baclofen. Strotman admitting that his minimal efforts to exercise and stretch had provided little relief. CRNP Jack Arango tried to educate Strotman as to the effects of prolonged Baclofen usage, as well as alternative medications. Strotman became agitated, started to curse, and left the room. CRNP Arango planned to have Strotman follow up in the physician line, also known as the "MD line." (*Id*.) Dr. Valley saw Strotman on July 18, 2017, relative to his complaints of chronic lower back pain. Dr. Valley agreed to renew Strotman's Baclofen prescription. (*Id*., p. 166.)

On August 2, 2017, Strotman saw PA Michael Gomes and requested that his Baclofen be renewed. PA Gomes observed that Strotman did not demonstrate pain behavior or an antalgic gait. No significant back spasms were noted upon exam. PA Gomes advised Strotman that Baclofen was not medically indicated given his current presentation, but he would discuss changing him to a different NSAID or medication that could be used for long term pain management. (*Id*.) Strotman requested to be seen by the doctor. On August 9, 2017, Dr. Valley renewed Strotman's Baclofen prescription for fourteen days. Strotman was directed to return to sick call if his pain continued. (*Id*., pp. 163, 234.) Strotman returned to sick call on August 21, 2017, with complaints of persistent back pain and stating

that he only wanted to be seen by a doctor.  PA Gomes entered an order for Strotman to appear in MD line to discuss his request for Baclofen.  (*Id*., pp. 147, 163.)  On August 25, 2017, when Dr. Valley saw Strotman, he agreed to renew the Baclofen for two weeks and to recheck Strotman in two weeks.  (*Id*., pp. 161, 234.)

Strotman saw Dr. Valley on September 8, 2017 and requested that the Baclofen prescription be renewed due to his chronic back pain.  Dr. Valley renewed Strotman's Baclofen for 3 weeks.  (*Id*., pp. 147, 162, 232, 233.)  On September 20, 2017, Strotman appeared before CRNP Arango to request a renewal of his Baclofen.  CRNP Arango reported that as there was no standing order for Baclofen, Strotman needed to see the physician to be evaluated.

On September 27, 2017, Dr. Alicia Chilito saw Strotman for his complaints of occasional numbness throughout his right leg which lasted a few seconds to a few minutes.  He denied any pain.  He requested Baclofen after reporting a history of motor vehicle and ATV accidents in 2003 and 2006.  On exam, Strotman's right leg had normal strength, and he had a negative straight leg raise test with normal gait.  Dr. Chilito's assessment included right leg spasms as per patient, causing him difficulty with walking.  She advised Strotman that in order to renew the Baclofen, it was necessary to assess the degree of nerve impingement or damage, if any, to validate the medication.  She also explained that Strotman had not done any physical therapy.  She noted that Strotman was "very defensive [and] wanted his

medicine." (*Id.*, p. 162.)  Dr. Chilito ordered a physical therapy consultation for

normal examination and gate.  She planned to consider a nerve conduction study if

physical therapy did not resolve the issue.  (*Id.*, pp.137–138, 162.)

Strotman saw PA King on October 22, 2017, and Baclofen was provided.

(*Id.*, pp. 142, 155–159, 230.)  On October 24, 2017, Strotman had a physical

therapy appointment with Physical Therapist ("PT") Eugene Zappa.  Strotman

recounted his six to seven-year symptoms of lower back pain with intermittent

right leg numbness to his right foot.  He told PT Zappa that Baclofen had been

helping.  Upon examination, PT Zappa found Strotman had bilaterally tight

hamstrings, chronic back pain with radiculopathy to right lower extremity, possibly

due to instability in the lumbar region.  Low back flexibility exercises were

discussed with Strotman.  PT Zappa's plan was to follow up with Strotman in a

month.  (*Id.*, p. 138.)  Strotman saw PA King the same day, and when Strotman

asked about Baclofen, PA King noted it was renewed.

On October 31, 2017, Dr. Christina Doll placed a request for Strotman to be

referred to physical therapy due to chronic low back pain with radiculopathy to the

right leg.  She also noted the possibility of lumbar instability and that he was seen

by physical therapy on October 24, 2017.  (*Id.*, p. 135.)

On November 7, 2017, PA King saw Strotman for ongoing complaints with

his back and right foot numbness.  The plan was to reorder Baclofen pending

10

approval. (*Id*., pp. 153, 228.)  Strotman missed his November 17 and November

27, 2017 sick call appointments. (*Id*., pp. 153.)

On November 29, 2017, Strotman requested that PA Gomes renew his

Baclofen.  He was unhappy with the dosage being reduced and that he was only

receiving two-week prescription renewals.  PA Gomes educated Strotman on the

effects of long-term usage of muscle relaxers such as Baclofen and that the

medication was not medically indicated.  The plan was to taper him off the

medication and to follow up in two weeks or sooner as needed.  PA Gomes made

an appointment for Strotman to be seen in MD line on December 13, 2017.  The

medical director, Dr. Nelada, co-signed the order. (*Id*., pp. 153, 154.)

PA King saw Strotman on December 6, 2017, concerning his medications.

Strotman reported that his symptoms had increased while being tapered off the

Baclofen.  PA King's assessment included neuropathy, and found no defects on

exam.  PA King planned to continue Baclofen in a 20mg dosage three times a day

until January 5, 2018, at which time the clinical indication for the medication

would be reviewed.  Strotman was again advised that Baclofen was not meant for

long term use. (*Id*., p. 152.)

Dr. Kelada Bassem saw Strotman on December 13, 2017, to discuss his back

pain.  Strotman reported dull right lower back pain, 3/10 pain, with numbness in

the right leg.  He stated the numbness was less frequent and severe with the

Baclofen.  Dr. Bassem noted that because Strotman reported the pain getting better with Baclofen, he thought it was muscular in origin.  Dr. Bassem planned to continue Strotman's Baclofen and revaluate in two months.  (*Id.*, p. 151.)

At Strotman's December 19, 2017 physical therapy appointment, Strotman reported an improvement in his low back pain, but that he still suffered from some right leg numbness.  He noted that the Baclofen helped but when weaned off the medication, the numbness returns.  PT Zappa's assessment included chronic back pain with radiculopathy to right lower extremity and lumbar instability.  The plan was to add trunk stabilization exercises to the present program.  (*Id.*, p. 136.)

On February 26, 2018, PA Randyl Gessel saw Strotman for his Baclofen refill request and reported right leg numbness.  PA Gessel, noting that the doctor was refilling the Baclofen prescription regularly, prescribed Baclofen in a 20 mg. dosage three times daily to continue until March 12, 2018.  PA Gessel also ordered a lumbar spine X-ray due to Strotman's continued complaints of back pain. Strotman was directed to appear in MD line to review the results of his x-rays and discuss his use of muscle relaxants.  (*Id.*, pp. 22–23, 129.)  The February 28, 2018, lumbar spine x-ray study revealed mild scoliosis possibly due to spasm with no evidence of fracture or dislocation.  (*Id.*, p. 14.)

On March 5, 2018, Dr. Ekwunife saw Strotman for his Baclofen refill request.  Strotman recounted his history of neck pain, anxiety/depression,

insomnia, migraines, and low back pain.  His medications included Baclofen, Prozac, and Excedrin.  On exam he had mildly limited range of motion with extension of his neck.  The same was noted for his lumbar range of motion.  Dr. Ekwunife re-ordered Baclofen for seven days.  (*Id.*, p. 128.)

Strotman presented on March 12, 2018 to the medical unit where he was seen by PA King for complaints of ongoing back pain with associated numbness in his legs.  PA King noted that Baclofen was approved for him in the last six months for long term use.  PA King wrote a prescription for Baclofen 20 mg, three times daily until May 10, 2018.  (*Id.*, p. 127.)

PA Gessel saw Strotman on March 19, 2018, for his complaints of chronic nerve pain into his right foot when not on Baclofen.  PA Gessel reviewed his lumbar X-ray and 2014 MRI results.  PA Gessel noted Strotman was never formally evaluated by a specialist.  The plan was to renew Baclofen for two weeks and to have Stroman follow up for a possible referral to an outside specialist.  PA Gessel also placed a request for him to be seen by physical therapy.  PA Gessel noted that Strotman had been on chronic Baclofen with relief and he should be evaluated for possible etiology and treatment options.  (*Id.*, pp. 12, 23, 126, 220.) Strotman was seen again by PA Gessel who renewed the Baclofen until April 16, 2018.  (*Id.*, pp.12, 23, 126, 220.)  Strotman failed to appear for his April 30, 2018, sick call appointment.  (*Id.*, p. 122.)

On May 2, 2018, Strotman met with PA Gessel at sick call and related that he could not function without the Baclofen due to pain. PA Gessel noted Strotman's upcoming physical therapy appointment and that no further muscle relaxants were indicated given his current status. PA Gessel planned to place a neurosurgery consult request. (*Id*., p. 121.) On May 11, 2018, a review was conducted pursuant to PA Gessel's request. PA Gessel noted Strotman's unresolved chronic neck and low back pain and multiple medications, including Baclofen, NSAIDs, tricyclic antidepressant, serotonin-norepinephrine reuptake inhibitor, and Topiramate. Prior work-ups included a 2014 MRI that was within normal limits, a lumbar spine x-ray that revealed mild scoliosis but no degenerative disc disease, and a 2016 cervical spine x-ray that revealed mild scoliosis but no degenerative disc disease. Following the review, an alternative treatment plan was set in place which directed Strotman to be seen in the MD line. (*Id*., p. 1.)

PT Zappa saw Strotman on May 15, 2018. He complained of right leg numbness of nine to ten years duration after he fell down a ladder. On exam, Strotman's trunk range of motion was within normal limits with pain in extremes on flexion. Bilateral lower extremities were within normal limits, strength was 5/5 and he had a normal gait upon ambulation. PT Zappa instructed Strotman on extension exercises and encouraged him to use good body mechanics. He was to follow up with physical therapy in two months. (*Id*., p. 13.)

### C. Strotman's Treatment by Dr. Petz

On May 15, 2018, Dr. Petz, upon examining Strotman, prescribed Baclofen in a 20 mg. dosage twice daily for two weeks, noting that Strotman's tenderness of the right leg along the lateral margin of his thigh was probably neuropathic. Dr. Petz noted that alternative medications would most likely be needed and entered an order for Strotman to be seen by PA Tipton in two weeks to discuss long term Baclofen use. (*Id.*, pp. 21, 120.) Dr. Petz also made a request for Strotman to be seen by physical therapy in two months. (*Id.*, p. 10.)

Dr. Petz saw Strotman again on May 29, 2018, as a follow up for his complaints of chronic lumbar pain. Dr. Petz's assessment included back pain of the lumbar spine. He noted that pursuant to his last discussion with Strotman, the plan was to transition from Baclofen to Motrin to over-the-counter Motrin. He prescribed Motrin at 600 mg. three times daily to continue until July 27, 2018. He directed Strotman to follow up in PA line in two weeks. (*Id.*, pp. 118, 219.)

On May 31, 2018, PA Gessel saw Strotman for his complaint that he received Motrin instead of Baclofen as he was told. PA Gessel advised that "MD stated in last note that no further Baclofen was indicated." (*Id.*, p. 117.) On June 8, 2018, PA Gessel evaluated Strotman for an injury to his right fifth toe. He reported numbness and tingling into right leg and his fourth and fifth toes secondary to not being on Baclofen. His wound was dressed, and a consult was

placed to "neuro." (*Id.*, p.116.) He was seen by nursing staff on June 12, 2018, for a dressing change of his right toe. (*Id.*, p. 114.)

PA Pantal saw Strotman on June 12, 2018, for his inquiry about a neurology consult. PA Pantal planned to reschedule Strotman for PA line following the outcome of the consult. (*Id.*, p. 113.)

On July 12, 2018, Dr. LeClerc saw Strotman for his request for Baclofen. Dr. LeClerc noted his review of Strotman's medication included Ibuprofen and Excedrin. He noted that adding Baclofen was not indicated, particularly after he was weaned off of the medication. (*Id.*, p. 112.)

On July 16, 2018, Strotman requested that PA Gessel renew his Baclofen. After PA Gessel advised that he was not to receive Baclofen, Strotman requested Neurontin. After PA Gessel stated that Neurontin was not indicated, Strotman became verbally abusive. On July 17, 2018, Strotman refused to be seen by PT Zappa. At that point Strotman was discontinued from the physical therapy line. (*Id.*, pp. 109, 11.) On July 18, 2018, Dr. Petz noted Strotman refused physical therapy on July 18, 2018. (*Id.*, p. 108.)

On August 6, 2018, Strotman requested that his pain medications be refilled. Strotman stated that he did not want physical therapy because "I've already done it." (*Id.*, p. 106.) PA Gessel advised that no medication was indicated, and "his pain apparently isn't bad enough to warrant follow through on treatment plan."

(*Id.*)  Strotman then requested a follow up evaluation and treatment by physical

therapy.  PA Gessel requested the same and planned to see if physical therapy

recommended medication.  (*Id.*, pp. 106, 8.)  Dr. Petz signed off on PA Gessel's

request for additional physical therapy on August 8, 2018.  (*Id.*)

### D. Strotman's Treatment following Dr. Petz's Departure From SCI-Huntingdon

At his September 6, 2018 physical therapy appointment, Strotman described

the history of his back ailments and reported pain with occasional radiating

numbness to his right leg.  He also stated that Baclofen was the only medication

that helped him and that he had been off the medication for three to four months.

(*Id.*, pp. 8–9.)  Based on a physical exam, PT Zappa noted Strotman's range of

motion for his trunk to be within normal limits with no spasms.  He had a positive

right straight leg raise at forty degrees, and his walking was normal.  PT Zappa

reviewed all lower back exercises with Strotman and encouraged the use of good

body mechanics and lifting techniques.  The plan was to discontinue physical

therapy.  (*Id.*)  After Strotman failed to appear for an October 5, 2018 sick call

visit, it was noted that Strotman should sign up for sick call as needed.  (*Id.*, p.

105.)

Strotman appeared at sick call on October 26, 2018, requesting renewals of

Baclofen and Excedrin for his neck pain.  CRNP Baldauf indicated Strotman

would be provided Ibuprofen and reassessed for Excedrin following an Ibuprofen

trial.  Strotman was not provided Baclofen, as it was not indicated.  (*Id.*, p. 32.)  On

October 29, 2018, CRNP Baldauf saw Strotman and renewed his Excedrin

prescription.  (*Id.*, p. 30.)  Strotman was seen on December 5, 2018 for a renewal

of Excedrin due to lumbar pain.  She renewed Strotman's Excedrin and advised

him to follow up as needed.  (*Id.*, p. 26.)

On May 24, 2019, Strotman reported to sick call with complaints that when

he twists certain ways or stands up too quickly, his right leg would go numb.  He

reported right lower back pain radiating down the back of his right leg and

numbness several times a day.  CRNP Baldauf's exam of Strotman noted his

lumbar range of motion was limited due to pain, although sensation was intact.

She prescribed Baclofen 10 mg three times a day until June 7, 2019, as well as

Motrin 600 mg, three times a day until June 6, 2019.  Strotman was directed to

follow up as needed.  (*Id.*, p. 24, 208.)  During this time, Strotman failed to appear

for his Baclofen on several occasions.  (*Id.*, pp. 206, 208.)  As of September 24,

2020, Strotman had not been prescribed Baclofen since approximately June 2019.

(*Id.*, pp. 190–208.)

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district

court to exercise subject matter jurisdiction in civil cases arising under the

Constitution, laws, or treaties of the United States.

### STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019), *reh'g granted and opinion vacated,* 946 F.3d 637 (3d Cir. 2020), and *on reh'g,* 948 F.3d 133 (3d Cir. 2020) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Dr. Petz and CCS seek summary judgment on two separate grounds. First, Dr. Petz argues that Strotman has failed to set forth facts establishing that he was deliberately indifferent to Strotman's alleged serious medical needs. Next, CCS argues that Strotman fails to articulate a cognizable constitutional claim against them. Specifically, CCS states it cannot be held liable pursuant to 42 U.S.C. § 1983 on a *respondeat superior* theory of liability. The court will address each argument.

### A. Strotman's Eighth Amendment Claim against Dr. Petz

The court construes Strotman's claim as a violation of his right to constitutionally adequate medical care for his cervical and lumbar spine condition and pain under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." (internal quotation omitted)).

In the prison context, an Eighth Amendment claim of deficient medical care must establish two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition. *See Ryle v. Fuh*, 820 F. App'x 121, 123 (3d Cir. 2020) (citing *Estelle*, 429 U.S. at 104.) A medical need is serious if it "has been diagnosed by a physician as requiring treatment or one that

is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation omitted). "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009). In order to find deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The Third Circuit Court of Appeals has found deliberate indifference where a prison official knows of an inmate's need for medical care and intentionally refuses to provide it, delays it for non-medical reasons, or prevents the prisoner from receiving needed or recommended treatment. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1992).

A prisoner does not have the right to choose his medical treatment. *See Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (citing *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)). A prisoner's disagreement with a prison medical professional's judgment, or a difference of medical opinion between two physicians, does not demonstrate an Eighth Amendment violation because "[t]here may … be several acceptable ways to treat an illness." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990). Courts accord prison medical providers "considerable latitude in the diagnosis and treatment of prisoners," *Durmer v.*

22

*O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993), and generally "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment … [which] remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alternations in original).

However, "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir 2017). "[P]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition." (*Id.*) (citations and internal quotations marks omitted). They cannot "deny reasonable requests for medical treatment …[when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" (*Id.*) (citing *Monmouth Cnty. Corr. Inst. Inmates*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)).

Accordingly, a diagnosis or treatment rendered, even if incorrect, without the requisite accompanying culpable state of mind, does not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 106; *Farmer*, 511 U.S. at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause…" *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Where a state of mind is relevant, the complaint is inadequate if it merely contains conclusory allegations describing the defendant's requisite state of mind such as "intentionally" or "recklessly" without supporting factual allegations. *Wilson v. Seiter*, 501 U.S. 294, 297–98 (1991); *Pearson v. Prison Health Serv.*, 850 F.3d 526, 539 (3d Cir. 2017).

Thus, in order to allege a cognizable Eighth Amendment violation, Strotman was required to plead facts showing that: 1) he suffered from a sufficiently serious medical need; 2) Dr. Petz was subjectively aware of facts from which the inference could be drawn that failure to provide treatment for that need posed a substantial risk of serious harm or undue suffering; and 3) Dr. Petz, in fact, drew that inference but disregarded the risk anyway.  In his amended complaint, Strotman alleges that in the Summer of 2018, Dr. Petz "inexplicably" reduced the strength and frequency of his Baclofen, and then ultimately discontinued it, causing him to suffer "significant and persistent pain, discomfort and impaired mobility."  (Doc. 8, p. 9.)  The uncontradicted record before the court paints a contrasting picture of Strotman's medical care by Dr. Petz and a myriad of other medical professionals.

Dr. Petz does not dispute Strotman's allegation that radiating spinal pain constitutes a serious medical need.  Rather, Dr. Petz focuses on demonstrating that he and other medical staff were consistent in evaluating Strotman's complaints, and diligent in providing him with treatment for his chronic spinal pain.  There is

24

no indication that Dr. Petz tapered Strotman off Baclofen for non-medical purposes or failed to address his pain via other pharmaceutical or therapeutic treatments when doing so.

The record undisputedly supports these factual determinations. Strotman was seen on a frequent basis for his complaints of pain throughout Dr. Petz's tenure at SCI-Huntingdon. While Strotman takes issue with Dr. Petz's decision not to prescribe his medicine of choice (Baclofen) for his pain and numbness, there is no evidence to suggest that Dr. Petz ignored or directed others to ignore Strotman's complaints of ongoing pain and requests for a Baclofen prescription. Rather, Strotman's treating physicians and other care providers documented throughout his record (both before and after his treatment by Dr. Petz) that the prolonged use of Baclofen was not medically indicated or recommended. Thus, Dr. Petz did not ignore Strotman's chronic complaints of pain, he simply did not agree that Baclofen was an appropriate medication to address his complaints when the repeated physical examinations, x-rays, and other studies did not support its dispensation on a regular basis as previously prescribed. Moreover, Strotman's frequent medical examinations for right leg numbness and pain consistently failed to reveal strength abnormalities, gate irregularities, spasms, or interference with his range of motion.

In sum, Strotman's disagreement with the alternative medications and treatment plans offered by Dr. Petz and his medical team to address his medical problems does not rise to the level of a constitutional harm. There is no evidence to support a finding that Dr. Petz possessed the requisite state of mind for deliberate indifference to Plaintiff's complaints of pain. *See Farmer*, 511 U.S. at 834. Because the court does not perceive a genuine dispute concerning the intent element of Strotman's deliberate indifference claim against Dr. Petz, summary judgment will be granted in favor of Dr. Petz.

## B. Strotman's Eighth Amendment Claim against CCS

CCS contracted with the DOC to provide medical care to inmates housed at SCI-Huntingdon and other state correctional institutions. The Third Circuit Court of Appeals has held that "a private health care company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.'" *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003)). Rather, a plaintiff must allege that the private healthcare company had "a relevant … policy or custom, and that the policy caused the constitutional violation [he] allege[s]." *Natale*, 318 F.3d at 584; *see also Lomax v. City of Philadelphia*, No. 13-CV-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017) ("Because [defendant] is a private company contracted by

a prison to provide health care for inmates, … it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs.")

Here, Strotman fails to allege any facts demonstrating that the alleged violation of the Eight Amendment resulted from any policies, practices, or customs established by CCS.  *See McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) (noting that to assert a plausible claim, the plaintiff "must identify [the] custom or policy, and specify what exactly that custom or policy was").  For that reason, CCS is entitled to judgment on Strotman's claim against CCS.

## CONCLUSION

For the foregoing reasons, the court finds that Dr. Petz is entitled to summary judgment because there is no evidence that he was deliberately indifferent to Strotman's serious medical needs.  CCS is also entitled to summary judgment as to Strotman's claim which is based exclusively on the alleged acts or omissions of its employees.  An appropriate order follows.

s/ Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Dated:  July 22, 2021                    Middle District of Pennsylvania